## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DWAIN DAVID GABLE,** | : | **Civil No. 1:21-cv-00194** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security[1],** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

One of the bedrock tenets of Social Security disability law is the concept that "ALJs have   a duty to develop a   full   and   fair record in social security cases." Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995). As part of this duty, "an ALJ must  secure  relevant  information  regarding  a  claimant's  entitlement to social security benefits." Id. The instant case aptly illustrates the importance of the basic notion of fairness.

Dwain  Gable,  a  younger  individual  and  right-arm  amputee,  filed  an application for disability and disability insurance benefits under Title II of the Social

---

[1] Kilolo Kijakazi became the  Acting  Commissioner of Social  Security on July 9, 2021. Accordingly,  pursuant  to Rule 25(d) of the  Federal Rules of Civil Procedure  and  42 U.S.C. § 405(g) Kilolo Kijakazi is substituted  for  Andrew Saul as the defendant in this suit.

Security Act on June 21, 2019. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ denied his application for benefits finding that Gable was not disabled as of the onset date of disability of March 25, 2013. Curiously, the ALJ limited Gable to a light work residual functional capacity ("RFC"), despite testimony from a vocational expert that Gable's lifting limitations would limit him to sedentary work. Indeed, the three occupations which the ALJ found Gable could perform were noted by the vocational expert, and the ALJ in his decision, as sedentary level occupations. Nonetheless, the ALJ's RFC determination limited Gable to light work. Additionally, while the ALJ noted at the hearing that further examination or medical expert evidence may have been necessary with respect to Gable's left arm impairments, and at least one state agency expert opined that the medical record was inadequate, the ALJ never ordered such additional evidence, further complicating the internal contradiction in the ALJ's decision limiting Gable to a light work RFC.

This matter is before us, upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. After reviewing the parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, and given the internal inconsistencies in the ALJ's decision, we find the ALJ's decision is not supported by substantial evidence.

Accordingly, the Commissioner's final decision will be vacated and remanded for further consideration.

## II.   **Statement of Facts and of the Case**

On June 21, 2019, Gable protectively filed under Title II for a period of disability and disability insurance benefits. (Tr. 15). Gable alleged disability due to right forearm amputation and limited use of the left arm and thumb. (Tr. 62). Gable alleged an onset date of disability of March 25, 2013, when Gable was 42 years old. (Tr. 15, 24). On the date of the ALJ's decision, Gable had past relevant work experience as a truck driver and "a composite position consisting of a truck driver and a collector." (Tr. 23).

With respect to these alleged impairments the clinical record, medical opinions, and the plaintiff's activities of daily living revealed the following: On March 25, 2013, Gable's dump truck rolled over and pinned him down, causing a "C-7 transverse process fracture, right rib fractures, right pneumothorax, right forearm traumatic amputation, left forearm degloving injury, left radial styloid fracture, [] left dorsal hand laceration, abdominal wall laceration down to the fascia, compartment syndrome of the left upper extremity, [] deep vein thrombosis in the right common femoral vein," and sternal fracture. (Tr. 278, 289-90). Gable was admitted to Cooper University Hospital on March 25, 2013—he had surgeries on left upper extremity arteries, left hand, right hand amputation, and abdominal

laceration on March 25; surgery to repair a left elbow fracture and ligament tear on March 27; a procedure to close a wound on April 3; a skin graft to the abdomen on April 11; and surgery for a left wrist fracture on April 17, 2013. (Tr. 276-277, 309). Gable was discharged from Cooper University Hospital on April 19, 2013, and presented to Good Shepard for rehabilitative services, including physical and occupational therapy. (Tr. 309).

Prior to his discharge from Cooper University Hospital, Gable spoke with professionals from Behavioral Medicine and Psychiatry departments. (Tr. 309-10). Gable stated that he did not remember the incident and did not have nightmares or flashbacks; he denied hopelessness. (Tr. 310). On April 11, 2013, Dr. Joaquin Stable, M.D., recorded an impression that Gable had Axis I Adjustment disorder with anxiety. (Tr. 314). Dr. Stable stated, "Patient is adjusting as expected to this trauma. No current concern for acute stress disorder. Please restart Zoloft, which patient was on prior to admission . . . . Patient endorsing insomnia. Please start Trazodone . . . ." (Tr. 314). On the same day, Christina Nash, M.S., Behavioral Medicine Fellow, recorded that Gable "denied any symptoms of anxiety, depression and trauma at this time." (Tr. 315).

Throughout the remainder of 2013 and until 2019, Gable reported anxiety and depression when he visited Health Center at Emmaus for treatment by Dr. Frans T. Zetterberg, D.O. (Tr. 565-66, 70, 74-76, 80, 84-92, 96-97; 635-36). In 2015, Dr.

4

Zetterberg noted that "Zoloft works . . . . He is still out of work. He is the stay-at-home dad. He is watching the kids and going [sic] a lot of yard work. Pain in his right arm is minimal, and he is off gabapentin. He still has problems with his left shoulder." (Tr. 578).

In an adult function report dated July 23, 2019, Gable reported that he cannot lift "much," that "everything takes much longer to do," which is "very frustrating," and that he loses concentration "quickly." (Tr. 213). Gable stated that he regularly lets the dog out, talks to his wife, and watches television, that he is never comfortable, which affects his sleep, and that his wife and sons help him with most things when they are home. (Tr. 214). He stated that he cannot handle zippers or buttons and that he uses a scrubber and a wand for bathing and toileting. (Id.) His wife cooks for him, that he "almost never" prepares food or meals, that cooking takes him "[forever]" when he tries, and that he does not cook because he is "not much of a cook." (Tr. 215). Gable further reported that he does laundry every couple of days and that he mows the yard weekly. (Id.) He was able to shop in stores and by computer, and that shopping took him one hour each week. (Tr. 216). Gable reported that he can pay bills, handle a savings account, and use a checkbook or money orders, but that he cannot count change and that his "wife carr[ie]s that money now." (Tr. 216-17). Gable also stated that he cannot walk far without resting for five minutes. (Tr. 218). He has a prosthetic right arm but does not use it much because it is "very

uncomfortable." (Tr. 219). Gable reported that he has pain in his left shoulder, left arm, left hand, back, neck, and right forearm when he bends, lifts, writes, eats, and does washing, and that the pain occurs "off and on" daily. (Tr. 221).

In an adult third-party function report dated July 23, 2019, Gable's wife, Tracey L. Gable ("Tracey"), stated that she spends approximately eight hours per day with Gable in which they "talk, make dinner, watch [television], [and] go to kids['] sports events." (Tr. 204). Tracey stated that Gable's left arm "only functions at 40%," and that Gable cannot "turn his arm or bend it like normal[, and] his thumb doesn't grasp things." (Id.) She reported that she does the household chores, takes care of the children, and "does most of [Gable's] jobs because he is unable to." (Tr. 205). She said that, from the time Gable wakes until he goes to bed, he takes care of the dog which means he lets the dog out, he does the laundry and mows the grass, and he watches television. (Id.)

Tracey further reported that Gable cannot button pants, zip coats, shave his head, work on cars, ride snowmobiles or ATVs, bowl, play sports with children, hunt, nor lift or build things, though he used to do these things, and that he needs special equipment to use the toilet but can shower by himself. (Id.) She stated that Gable does not prepare his own meals because he cannot open jars, remove heavy items from the oven, or dump pots of water, and he only has snacks when she is not present. (Tr. 206). Gable does drive a car and shops in stores for items for his

children or "an item" if she needs it. (Tr. 207). Tracey reported that Gable can pay bills, handle a savings account, and use a checkbook or money orders, but that he cannot count change because he cannot pick up coins. (Tr. 207). She stated that, since the dump truck accident, there have been no changes in Gable's activities. (Tr. 208). Tracey also stated that Gable is "forgetful" and loses "concentration sometimes," but can follow instructions, especially written instructions. (Tr. 209).

It is against the backdrop of this evidence that the ALJ conducted a hearing in Gable's case on April 29, 2020. (Tr. 15). Gable appeared by phone. (Id.) Gable and a vocational expert both testified at this hearing. (Tr. 34-60). At the hearing, Gable, through his attorney, requested that the ALJ specifically consider a functional equivalence to Listings 1.05 and 1.07. (Tr. 38-39). Toward the beginning of the hearing, the ALJ told Gable that the ALJ would question Gable about the length of time Gable has been unable to use two fingers on his left hand to determine whether the condition existed before Gable's last insured date, and that, "depending on Mr. Gable's testimony here today, the consultative exam is still not out of the question here." (Tr. 40). The ALJ added, "I'll consider that, either a consultative exam or employing the use of a medical expert to take a look at everything because I still have a lot of questions about that condition as it existed back in December of 2018," prior to Gable's last insured date. (Id.)

Gable testified that he left school in the eleventh grade, and that he received a CDL and has only worked as a truck driver but occasionally also handled collection of trash while driving a garbage truck. (Tr. 41). He stated that his CDL was taken away after the dump truck accident in which he was injured. (Id.) He testified that he was right-handed, and that his right arm was amputated below the elbow. (Tr. 43). Gable reported that he does not use a prosthetic hand because it is "real tight and heavy. It's hard to hold up . . . ." (Id.) He testified that he uses his right arm to steady his left hand for writing, eating, and putting away dishes, and that he must use both extremities to write. (Tr. 44). He also testified that he uses an adaptive device to drive, and that he can carry groceries by placing the handle over his amputation. (Tr. 44-45).

Gable reported to the ALJ that he has no feeling in part of his left arm, that his middle and ring fingers are permanently curved at the end, that he can barely move his thumb an inch, and that he has little strength in his left arm, not enough to lift two gallons of milk at a time. (Tr. 46, 51). Gable testified that he can reach straight out in front of himself, such as to a typewriter or a table with utensils on it, but that he cannot rotate his arm or reach overhead correctly. (Tr. 46-47). He further testified that he can type, but did not specify a speed. (Tr. 47). Gable also testified that he wears shorts all the time, even in the winter, because he cannot put on pants or zip or button pants. (Tr. 51).

With respect to his depression, Gable testified that, as of December 2018, Zoloft "pills have been working good," and although he loses concentration when watching television and reading the paper, he regains it "right away." (Tr. 47-48). As for pain, Gable testified that he experiences bad phantom pain "once or twice a month . . . . [for] maybe like five minutes." (Tr. 48).

The ALJ asked the vocational expert about

> [A]n individual with the same age, education, and work experience [as Gable] . . . . [who] would be limited to no more than light exertional work as defined in the regulations with the following additional limitations. This individual would be limited to use of his right upper extremity for guidance purpose only, meaning no lifting, carrying, pushing, or pulling with the right upper extremity. He would be limited to lifting and carrying no more than ten pounds occasionally with the left upper extremity. He must avoid unprotected heights and dangerous moving machinery. He must avoid overhead reaching with the left upper extremity and he'd be limited to no more than frequent reaching in all other directions with either upper extremity, meaning the bilateral upper extremity.

(Tr. 55). The vocational expert testified that such a person could not perform Gable's past work and that because of the limitation of lifting only ten pounds, the sedentary exertional level was the correct one. (Tr. 55-56). The vocational expert testified that such a person could perform the jobs of:

(1) surveillance-system monitor, DOT number 379.367-010, with 135,390 jobs in the national economy;
(2) inspector, DOT number 669.687-014, with 151, 670 jobs in the national economy; and
(3) order clerk, DOT number 209.567-014, with 169,120 jobs in the national economy.

(Tr. 56).

Then the ALJ asked the vocational expert to consider:

[A]n individual with the same age, education, and work experience [as Gable] . . . . [who] would be limited to no more than light exertional work as defined in the regulations with the following additional limitations. This individual would be limited to use of his right upper extremity for guidance purpose only, meaning no lifting, carrying, pushing, or pulling with the right upper extremity. He would be limited to lifting and carrying no more than ten pounds occasionally with the left upper extremity. He must avoid unprotected heights and dangerous moving machinery. He must avoid overhead reaching with the left upper extremity and he'd be limited to no more than [occasional] reaching in all other directions with either upper extremity, meaning the bilateral upper extremity.

(Tr. 55-56). The vocational expert testified that "the only job . . . would be the system monitor" job. (Tr. 56). The vocational expert testified that, if, additionally, such a person was limited to "no more than occasional handling with the left upper extremity," the only position which such a person could do would still be system monitor. (Tr. 57). The vocational expert testified that the Dictionary of Occupational Titles considers the job of system monitor to have "no handling, fingering, feeling, [nor] reaching" but that, based on experience, the vocational expert believes the job of system monitor actually requires "occasional" handling, fingering, feeling, and reaching because "the system monitor does have to use their hands to some degree throughout the day . . . . [w]hether it's . . . grasping an item or doing does input into a computer." (Tr. 57, 59).

The vocational expert testified that her testimony was consistent with the Dictionary of Occupational Titles, except for some description of Gable's past work and the absence of delineation between upper extremities with regard to manipulative limitations such as reaching and handling. (Tr. 57). She stated that her testimony was based on the experience of seeing the jobs actually performed. (Id.)

Following this hearing on June 2, 2020, the ALJ, without requesting any medical opinions or evaluations, issued a decision denying Gable's application for benefits. (Tr. 15-26). In that decision, the ALJ first concluded that Gable met "the insured status requirements of the Social Security Act through December 31, 2018, prior to the date Gable protectively filed a claim for Title II disability insurance benefits. (Tr. 17). At Step 1, the ALJ determined that Gable "did not engage in substantial gainful activity during the period from his alleged onset date of March 25, 2013[,] through his date last insured of December 31, 2018." (Id.) At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found Gable had the following severe impairments through Gable's last insured date: status-post right arm amputation; left arm dysfunction, status-post multiple surgeries; and obesity. (Id.) At Step 3 the ALJ determined that Gable did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the regulations. (Tr. 20).

Between Steps 3 and 4 the ALJ concluded that Gable retained

> [T]he residual functional capacity to perform *light work* as defined in
> 20 CFR 404.1567(b) except that the claimant can use his right upper
> extremity for guidance purposes only, with no lifting, carrying,
> pushing, or pulling. The claimant is limited to lifting and carrying no
> more than ten pounds occasionally with the left upper extremity. The
> claimant must avoid unprotected heights and dangerous moving
> machinery. The claimant must avoid overhead reaching with the left
> upper extremity and no more than frequent reaching in all other
> directions with the bilateral upper extremities.

(Id.) (emphasis added).

In reaching this determination, the ALJ considered the medical evidence as outlined above, as well as medical opinion evidence, Gable's testimony, and his wife's third-party function report. As for the opinion evidence, the ALJ found the opinion of Dr. Gurcharan Singh, M.D., a state agency consultant, partially persuasive. (Tr. 23). Dr. Singh opined that Gable could perform a range of light work with pushing, pulling, reaching, handling, and fingering limitations with his right upper extremity. (Id.) However, Dr. Singh's opinion did not consider any limitations with respect to Gable's left upper extremity. (Id.)

The ALJ also considered the opinion of Dr. David Hutz, M.D., a state agency consultant who opined that there was insufficient evidence to evaluate the claim. (Id.) The ALJ reasoned that this opinion was not persuasive because the record included yearly physical examinations through the date last insured. (Id.). Finally, the ALJ considered the third-party statement of Tracey Gable but found that her

reports of Gable's functional limitations were not consistent with the objective medical record. (Id.)

The ALJ also considered Gable's testimony regarding his limitations, but ultimately found that Gable was not as limited as he alleged. (Tr. 21-23). The ALJ recognized that Gable's impairments caused significant functional limitations but found that Gable's physical examinations between December 2014 and September 2018 were consistently within normal limits. (Tr. 22). The ALJ also noted that the plaintiff was able to perform some activities of daily living, such as yardwork, caring for pets, laundry, and driving. (Tr. 22-23).

The ALJ then found that Gable could not perform his past work but retained the capacity to perform other jobs that existed in significant numbers in the national economy. (Tr. 23-25). With regard to such work, the ALJ stated:

> The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative sedentary exertion, unskilled occupations such as a system monitor (DOT Code 379.367-010 with approximately 135,390 jobs available in the national economy), an inspector (DOT Code 669.687-014 with approximately 151,670 jobs available in the national economy), and an order clerk (DOT Code 209.567-014 with approximately 169,120 jobs available in the national economy).

> Incidentally, while the medical record does not support additional handling and fingering limitations, the vocational expert testified that an individual would still be able to perform the requirements of a system monitor even if this individual were limited to only occasional handling and fingering.

(Tr. 25). Thus, as we have noted, although the RFC limited Gable to light work, the ALJ found that the jobs he could perform were at the sedentary exertional level. Having reached these contradictory conclusions, the ALJ determined that Gable had not met the demanding showing necessary to sustain this claim for benefits and denied this claim. (Tr. 26). Further, while the ALJ and at least one state agency expert had suggested that there was a need to further develop the factual record regarding the extent of Gable's left hand neurological impairment, no such factual development took place and the ALJ simply concluded that the unrebutted testimony regarding this impairment was not credible.

This appeal followed. (Doc. 1). On appeal, Gable challenges the ALJ's decision in several respects, including the ALJ's failure to obtain a consultative examination with respect to Gable's left arm impairment. As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that given the internal inconsistencies in this decision, the ALJ's decision is not supported by substantial evidence. Accordingly, we will remand this case for further consideration by the Commissioner.

## III. <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the

findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency

factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [he] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B.**    **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or he was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe

impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and

recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   <u>This Case Will be Remanded for Further Consideration.</u>

As we have noted, one of the grounds Gable raises on appeal is the ALJ's failure to order a consultative examination with respect to the use of his left hand. He contends that such an examination was necessary to develop the record fully because the ALJ stated that the only medical opinion considered "did not adequately account for the claimant's limitations related to his left upper extremity." Moreover, Dr. Hutz opined that there was insufficient evidence in the record to render an opinion.

As a general matter, "[t]he decision to order a consultative examination is within the sound discretion of the ALJ." <u>Basil v. Colvin</u>, 2014 WL 896629, at *2 (W.D. Pa. Mar. 6, 2014) (citing <u>Thompson v. Halter</u>, 45 F. App'x 146, 149 (3d Cir. 2002); 20 C.F.R. §§ 404.1517, 416.917). Further, the exercise of this discretion is linked to an informed assessment of the evidence in each case. Thus:

> An "ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." Id. Other circumstances necessitating a consultative examination include situations where a claimant's medical records do not contain needed additional evidence, or when the ALJ needs to resolve a conflict, inconsistency or ambiguity in the record. <u>See</u>, 20 C.F.R. §§ 404.1519(a), 416.919(a).

Basil, 2014 WL 896629, at *2. See Rissmiller v. Colvin, 2016 WL 6107209, at *5

(E.D. Pa. Oct. 18, 2016). Therefore, a determination of whether a consultative

examination is needed in a particular case is a discretionary judgment by an ALJ and

is a judgment that should be firmly rooted in an assessment of the evidence as a

whole. Ultimately, "the ALJ's duty to develop the record does not require a

consultative examination unless the claimant establishes that such an examination is

necessary to enable the ALJ to make the disability decision." Thompson, 45 F.

App'x at 149.

In the instant case, we find that the ALJ's decision to forego a consultative

examination is not supported by substantial evidence, particularly in light of the

internal inconsistencies in the ALJ's opinion and the medical opinion evidence

suggesting a need for further development of the factual record. At the outset, the

ALJ noted at the beginning of the administrative hearing that he had questions with

respect to the plaintiff's left arm impairments, stating:

> So, I was trying to go back as far as I could, and there's a limited amount
> of medical records post-dating the date last insured so -- or even for a
> significant period of time between I think it's 2015 up to the date last
> insured. So, I was trying to, you know, get a better sense of what type
> of functional limitations we're talking about here and I think where I
> was having the most difficulty is trying to find out the limitations with
> regard to the left, upper extremity. Now, when you indicated inability
> to use two fingers in the left, upper extremity, I didn't -- and I may have
> missed that somewhere in the medical records, but there's very limited
> information in that respect. So I'm going to talk about that with the
> claimant and we'll see how long that's been the case and . . . depending

> on Mr. Gable's testimony here today, the consultative exam is still not out of the question here.
>
> . . . . .
>
> So I'll consider that, either a consultative exam or employing the use of a medical expert to take a look at everything because I still have a lot of questions about that condition as it existed back in December of 2018.

(Tr. 40). Gable then testified that he was unable to use his left thumb; that he used an adaptive device on his left hand in order to drive; he wears shorts year-round because he cannot manipulate zippers and buttons; he experienced numbness and tingling in his left arm; and that his ring finger and middle finger were curled at the end, making it hard to grasp things. (Tr. 44-46). Gable's testimony was entirely consistent with the adult function report submitted by his spouse which indicated that Gable's left arm "only functions at 40%.," (Tr. 204). The need for further consideration of this issue was further buttressed by Dr. Dr. Hutz who opined that there was insufficient evidence in the record to render an opinion on the question of disability.

Nonetheless, the ALJ ultimately determined at the conclusion of the hearing that he did not think a consultative examination was necessary. (Tr. 59-60). This determination appears to be based on the ALJ's satisfaction with the vocational expert's responses to his hypotheticals, which he stated he based on Gable's testimony regarding his limitations with his upper extremities. (Id.)

23

On this score, we find the ALJ's decision not to order a consultative examination to be particularly problematic for several reasons. First, and most significantly, the ALJ himself stated that there was a very limited amount of record evidence regarding Gable's left arm impairments, specifically from December 2014 to September 2018. This corroborates the opinion of Dr. Hutz, who opined that there was not enough evidence in the record to render an opinion on Gable's functional limitations. The ALJ found this opinion to be unpersuasive based on the fact that Gable had yearly physical examinations. Thus, the ALJ's decision on this score appears to be inconsistent, as he recognized the lack of medical evidence in the record but then discounted Dr. Hutz's opinion, relying on the admittedly scarce medical evidence in the record.

Further, the ALJ's decision at the conclusion of the hearing not to order a consultative examination appears to be based on the fact that he included Gable's limitations from his testimony in the hypotheticals to the vocational expert. However, the VE response to these hypotheticals was that Gable could perform work at the sedentary exertional level, given his ability to only lift and carry up to ten pounds. Yet, the ALJ's RFC stated that Gable could perform light work. This internal inconsistency may have been able to be resolved by a consultative examination regarding Gable's limitations with respect to his left arm impairments. See 20 C.F.R. §§ 404.1519a(b) ("We may purchase a consultative examination to

try and resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or a decision on your claim"). However, the ALJ ultimately limited Gable to a light work RFC, which was inconsistent with the ALJ's hypotheticals and the vocational expert's responses to those hypotheticals. Thus, we cannot conclude that the ALJ's decision not to order a consultative examination was supported by substantial evidence and we discern a prejudice which flowed from that failure to complete the medical record, since there are internal inconsistencies in the ALJ's decision regarding whether Gable could perform light or sedentary work.

Given the internal inconsistencies in the ALJ's decision, and the ALJ's own inconsistent statements regarding the sufficiency of the medical evidence in the record, we cannot conclude that the ALJ's decision not to order a consultative examination is supported by substantial evidence in the record. Accordingly, we will remand this case to the ALJ for further evaluation, development, and assessment of the medical record. Finally, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

III.   <u>**Conclusion**</u>

Accordingly, given that we find the ALJ's determination is not supported by substantial evidence, the final decision of the Commissioner will be VACATED, and this case will be REMANDED for further consideration by the Commissioner.

An appropriate order follows.

<u>/s/ *Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge